# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| UNITED STATES OF AMERICA, </br></br> v. </br></br> KINGSLEY R. CHIN, </br> ADITYA HUMAD, and </br> SPINEFRONTIER, INC., </br></br> Defendants. | ) </br> ) </br> ) </br> ) Criminal No. 1:21-cr-10256-IT </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) |

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF THEIR MOTION TO DISMISS COUNT EIGHT

Barry S. Pollack
Joshua L. Solomon
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
*Counsel for Defendants Kingsley R. Chin and SpineFrontier, Inc.*

Daniel N. Marx
William W. Fick
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*Counsel for Defendant Aditya Humad*

**Table of Contents**

Preliminary Statement ................................................................................................................. 1

Case Background and Relevant Allegations ............................................................................... 3

Discussion .................................................................................................................................... 6

    I.   The Money Laundering Charge Improperly Merges With The
Underlying AKS Charges. ........................................................................................... 6

        A.  Where the conduct constituting alleged money laundering is insufficiently separate
from the underlying crime, a merger-problem arises. .................................................... 6

        B.  The government's own theory of concealment money-laundering conspiracy runs
headlong into the merger problem. ............................................................................... 11

        C.  The amendment of 18 U.S.C. § 1956 to define "proceeds" as including "gross
receipts" renders the statute unconstitutional to the extent applied to use of gross
receipts to pay expenses of the underlying crime. ....................................................... 13

    II.  The Public Disclosure Of Spinefrontier Payments Precludes Any Charge Of Concealment
Money Laundering. ...................................................................................................... 14

Conclusion ................................................................................................................................. 16

Defendants Kingsley R. Chin, Aditya Humad, and SpineFrontier, Inc. respectfully submit this memorandum in support of their motion to dismiss Count Eight of the Indictment, which charges them with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

**Preliminary Statement**

The Indictment here alleges a scheme by which the defendants supposedly conspired to violate, and violated, the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2) (the "AKS"), in the form of paying surgeons for use of SpineFrontier's products in surgeries. As charged, the alleged scheme used an entity affiliated with the defendants, Impartial Medical Experts ("IME"), as a conduit for SpineFrontier to make the payments to uncharged co-conspirator surgeons. As alleged, the defendants used IME to conceal the true nature of those payments, by portraying them as payments for consulting work by the surgeons, rather than as payments to induce use of the SpineFrontier products. As charged, therefore, SpineFrontier's making payments to doctors *through IME* was a central component of the underlying AKS violations that the Indictment charges.

The AKS conspiracy charge (Count One) carries a statutory maximum sentence of imprisonment of five years. *See* 18 U.S.C. § 371. The substantive AKS charges (Counts Two through Seven) carry a statutory maximum sentence of imprisonment of ten years. *See* 42 U.S.C. § 1320a-7b(b)(1) & (2). As the Supreme Court has warned against, the government here tacked on an additional charge for money-laundering conspiracy (Count Eight), which carries a statutory maximum sentence of imprisonment of twenty years, *see* 18 U.S.C. § 1956(a)(1) & (h), apparently for the purpose of exposing the defendants to potential penalties far in excess of what the underlying crimes charged would permit, based on the same conduct. The sole theory behind the money-laundering charge is that the defendants allegedly conspired to use IME as a concealment

scheme to hide that the funds for use to pay the alleged kickbacks were actually coming from SpineFrontier.

In its zeal to add a charge carrying a maximum sentence that is two to four times as long as the maximum sentences for the underlying AKS charges, the government concocted a theory of conspiracy money laundering that is circular and not viable. To constitute concealment money laundering – the only type of money laundering that is charged as the object of the alleged conspiracy – the funds transferred must be "proceeds" from otherwise illegal conduct, and the purpose must be concealment of those proceeds. Here, the Indictment expressly alleges that the transfers to IME were for the purpose of providing IME with the funds necessary to make kickback payments, which allegedly made the scheme illegal in the first place. Thus, the payments to IME were not "proceeds" from a ***completed*** alleged illegal scheme, and were thus not transfers for the purpose of concealing that they were such proceeds. Rather, as expressly charged, the transfers to IME were the means by which the conduct was allegedly criminal in the first place.

This circularity in the money-laundering theory gives rise to a well-recognized flaw often referred to as a "merger problem." In short, where the underlying alleged criminal scheme is not sufficiently separate from the financial transactions alleged to constitute money laundering, such as where the financial transactions are for purposes of funding the underlying criminal activity, the money laundering charges improperly "merge" with the underlying crimes charged – here, the alleged payment of kickbacks to doctors by SpineFrontier through IME, in violation of the AKS. Courts recognize this problem as presenting an impermissible form of double jeopardy, as it results in the same course of conduct being charged as two separate crimes. Courts, including the U.S. Supreme Court, also view the merger problem as particularly improper where the money-laundering charge is used to increase the potential penalty beyond the maximum penalty for the

underlying crime that arises from the same charged conduct – as the government is transparently and insidiously doing here.

In addition, even apart from the merger problem, the money-laundering conspiracy charge necessarily fails here because undisputed (and indisputable) facts remove any possibility of concealment. The government chose to charge only concealment money laundering, not promotional money laundering. Its sole theory, therefore, is that the defendants agreed to transfer money to IME for the purpose of concealing that the funds for alleged kickbacks originated with SpineFrontier. Yet SpineFrontier, using its own name, disclosed the payments to the public and the federal government, in hundreds of filings under the federal Physician Payments Sunshine Act's disclosure requirements. In the face of those undisputed disclosures, the concealment allegation is not viable, serving as another legal bar to the supposed money-laundering conspiracy as charged.

## Case Background and Relevant Allegations

The Indictment alleges a scheme by which the defendants made payments to surgeons to induce them to use SpineFrontier products. In broad terms, the Indictment alleges that the defendants caused SpineFrontier to enter into an arrangement with its affiliate, IME, which in turn entered into consulting contracts with surgeons. It was through the IME-surgeon contracts that the alleged kickback payments were paid in the guise of consulting payments. Counts One through Seven charge conspiracy to violate, and violation of, the AKS. Count Eight charges conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

The substantive paragraph of Count Eight alleges that the defendants:

> conspired . . . to conduct and attempt to conduct financial transactions, to wit, transferring and causing to be transferred, funds to a corporation, Impartial Medical Expert, LLC, to pay, directly and indirectly, illegal bribes to surgeon physicians, knowing that the property involved in such transactions represented the proceeds

3

of some form of unlawful activity, and which in fact involved the proceeds of specified unlawful activity, that is, payment of remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, bribes, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B), and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Indictment ¶ 44.)

Several features of the manner in which the government chose to frame this charge are critical to this motion.

First, the alleged conspiracy is for so-called concealment money laundering only, ***not*** promotional money laundering. This charging decision is express in the above-quoted paragraph's allegation that the financial transactions "were designed, in whole and in part, ***to conceal and disguise*** the nature, location, source, ownership, and control of the proceeds of specified unlawful activity." (*Id.* (emphasis added).) It is also made clear through the Count's citation to 18 U.S.C. § 1956(a)(1)(B)(i), which applies to one who:

> … knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> ….
>
> (B) knowing that the transaction is designed in whole or in part—
>
>> (i) ***to conceal or disguise*** the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

Other provisions of the money-laundering statute, ***not*** charged here, prohibit "promotional" money laundering, which requires an intent to promote other illegal activities, not to conceal. For example, 18 U.S.C. § 1956(a)(1)(A)(i) applies to one who:

> … knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such

4

a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity….

The Indictment neither alleges any intent to promote, nor references § 1956(a)(1)(A)(i). It charges only concealment money laundering.

Second, the Indictment expressly alleges a conspiracy to transfer money to IME for the express purpose of funding the payments of the very kickbacks that the government claims make the defendants' conduct illegal in the first place, and thus that make the proceeds from that conduct unlawfully-derived funds. Specifically, as charged, the conspiracy was to transfer funds to IME "to pay, directly and indirectly, *illegal bribes* … knowing that the property involved in such transactions represented *the proceeds of* … payment of remuneration … that is, *bribes*, in violation of [the AKS]." (Indictment ¶ 44 (emphases added).) As charged, therefore, the agreement to transfer money to IME was to fund the same alleged kickback payments that would make the money being transferred to IME supposedly proceeds of illegal activity.

As discussed below, the obvious circularity in this allegation – that the transferring of money to IME to make kickback payments was money laundering because it was the proceeds of paying those same kickbacks – gives rise to a fatal merger problem by which the substantive crimes alleged merge improperly with the money-laundering crime alleged. Furthermore, because the alleged conspiracy was for only concealment money laundering and not promotional money laundering, the undisputed fact that the payments by IME to surgeons were reported to the federal government as payments *from SpineFrontier* to those surgeons – and thus in no way concealed – precludes any charge of concealment money laundering.

5

**Discussion**

I. **THE MONEY LAUNDERING CHARGE IMPROPERLY MERGES WITH THE UNDERLYING AKS CHARGES.**

   **A. Where the conduct constituting alleged money laundering is insufficiently separate from the underlying crime, a merger-problem arises.**

The Indictment's allegation is not that any underlying ***completed*** criminal conduct produced proceeds that were then concealed (*i.e.*, laundered). Rather, the Indictment alleges that the financial transfers to IME were ***part of*** the underlying criminal activity charged (i.e., the paying of bribes). Because the Indictment's theory is that the payments to IME for the purpose of paying bribes are both what make the alleged scheme illegal (and thus give rise to "proceeds" from unlawful activity), and also an act of concealment of those same proceeds, the money-laundering charge presents a "merger problem."

The Supreme Court described the merger problem in *United States v. Santos*, 553 U.S. 507 (2008), a case involving the operation of an illegal lottery, in which money collected from bettors was used to pay the expenses of operating the lottery, including paying employees and the lottery's winners. The government charged that the payments to employees and winners were a form of money laundering, which the Supreme Court recognized as presenting a "merger problem":

> If we accepted the Government's invitation to speculate about congressional purpose, we would also have to confront and explain the strange consequence of the "receipts" interpretation [of the word "proceeds"], which respondents have described as a "merger problem." If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1). Prosecutors, of course, would acquire the discretion to charge the lesser lottery offense, the greater money-laundering offense, or both – which would predictably be used to induce a plea bargain to the lesser charge.

6

> The merger problem is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds – example, the felon who uses the stolen money to pay for the rented getaway car – would violate the money-laundering statute. And any wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering. There are more than 250 predicate offenses for the money-laundering statute, and many foreseeably entail such transactions, *see* 18 U.S.C. § 1956(c)(7) (2000 ed. and Supp. V) (establishing as predicate offenses a number of illegal trafficking and selling offenses, the expenses of which might be paid after the illegal transportation or sale).

*Id.* at 515-17 (footnote and citations omitted).[1] As the above-quoted passage indicates, merger is particularly problematic where the money-laundering charge carries harsher penalties than the underlying crime, which the Court cautioned could be misused by prosecutors. *See also id.* at 517 ("The Government suggests no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime.").

Other courts, as well as Justice Stevens's opinion concurring in the judgment in *Santos* (which has been recognized as the controlling opinion[2]), have framed the merger problem in constitutional terms, viewing it as an issue of double jeopardy:

---

[1] *Santos*'s ultimate holding was that "proceeds" in the money-laundering statute should be interpreted to mean profits, not gross receipts, under the rule of lenity and to avoid the merger problem that the Court identified. *Santos*, 553 U.S. at 514, 517. Congress subsequently overruled that holding by amending the money-laundering statute to define "proceeds" to include gross receipts. Nevertheless, as the caselaw cited herein demonstrates, *Santos* continues to be cited by courts around the country not for its holding as to the meaning of "proceeds," which no longer applies post-amendment, but for its explanation of the merger problem that the Court was seeking to avoid through its narrow interpretation of "proceeds."

[2] The main opinion, authored by Justice Scalia, was for only a plurality of four Justices. Justice Stevens's opinion concurring in the judgment was necessary to obtaining a majority for that

7

> Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business. A money laundering conviction increases the statutory maximum from 5 to 20 years, and the Sentencing Commission has prescribed different Guidelines ranges for the two crimes.

*Id.* at 527 (Stevens, J., concurring in judgment) (footnote omitted); *see also Kennedy*, 707 F.3d at 563 ("[I]n convicting a defendant more than once for the exact same conduct, merger is comparable to double jeopardy." (citing *Santos*, 553 U.S. at 527 (Stevens, J., concurring))).

Since *Santos*, courts have articulated the merger problem in various ways, but generally focus on the need for ***factual separation*** between the underlying crime producing the proceeds and distinct money-laundering activity. As the Second Circuit recently held, the "merger problem" gives rise to "the rule that money laundering must involve proceeds of a ***separate*** crime." *Aronshtein v. United States*, No. 21-518-PR, 2023 WL 2770145, at *2 (2d Cir. Apr. 4, 2023) (emphasis added). In fact, while the government has not been willing to so concede here, elsewhere it has "agree[d] that the acts that produce the proceeds being laundered ***must be distinct*** from the conduct that constitutes money laundering." *United States v. Kelerchian*, No. 2:13-CR-66 JVB, 2017 WL 1532324, at *2 (N.D. Ind. Apr. 28, 2017) (emphasis added), *aff'd*, 937 F.3d 895 (7th Cir. 2019).

The Fifth Circuit has likewise described the problem of merger as occurring "when a defendant is convicted under two criminal statutes for what is actually a single crime; that is, convicted under the money laundering statute for essentially the same conduct that constitutes the conduct of the 'unlawful activity' upon which the money laundering count is premised." *Kennedy*, 707 F.3d at 563. When "address[ing] merger in the money laundering context, [courts] ask whether

---

judgment, rested on narrower grounds, and is generally recognized as controlling. *See, e.g.*, *United States v. Kennedy*, 707 F.3d 558, 564 n.14 (5th Cir. 2013).

8

the money laundering crime is based upon ***the same or continuing conduct*** of the underlying predicate crime, or whether the crimes are ***separate and based upon separate conduct***." *Id.* at 565 (emphases added). That court rejected a merger challenge because, unlike the offenses charged in this case, "the crimes of wire fraud [the underlying crime at issue there] were complete ***before*** the conduct underlying the money laundering counts began." *Id.* at 567 (emphasis added).

To illustrate the point, both the Fifth and Fourth Circuits have distinguished cases in which a defendant "transfer[s] the proceeds through various accounts into his own coffers," which presents no merger problem. *Stewart v. Keffer*, 514 F. App'x 504, 508 (5th Cir. 2013); *see also United States v. Cloud*, 680 F.3d 396, 406 (4th Cir. 2012) ("Initially, we note that *Halstead* was a standard money laundering case, where the defendant transferred the fraudulent proceeds through various companies and into his own coffers."). In contrast, there ***is*** a merger problem where defendants are "not charged with transferring the proceeds into [their] personal account[s], but with paying persons involved in the underlying fraud for services necessary to the operation of the fraud." *Id.* at 407. "In other words, *Halstead*'s healthcare fraud did not require the cooperation, procured via payment, of coconspirators to succeed. Cloud's mortgage fraud conspiracy, on the other hand, could not have succeeded otherwise." *Id.*

When assessing whether an indictment contains an improper merger of underlying and money-laundering conduct, courts must focus on whether the payments that would supposedly constitute money laundering were payments to co-conspirators and others for purposes of carrying out and funding the underlying crime:

> In this case, Cloud's money laundering convictions are based on payments to recruiters, buyers, and other coconspirators for the role each person played in the mortgage fraud scheme. Cloud's mortgage fraud depended on the help of others, and their help, in turn, depended on payments from Cloud. Such payments are no different than "the felon who uses the stolen money to pay for the rented getaway car" or "the initial recipient of the wealth" in "any wealth-acquiring crime with

9

> multiple participants ... [who] gives his confederates their shares." *Santos*, 553 U.S. at 516, 128 S.Ct. 2020 (plurality opinion). Because Cloud's money laundering convictions on Counts 28-33 were based on paying the "essential expenses" of his underlying fraud, we find a merger problem.

*Id.* at 406 (editing in original); *see also, e.g.*, *United States v. Moreland*, 622 F.3d 1147, 1166 (9th Cir. 2010) (finding a merger problem where the transfers alleged to constitute money laundering were "for the purpose of paying commissions" to those who participated in the underlying crime); *United States v. Van Alstyne*, 584 F.3d 803, 815 (9th Cir. 2009) ("The very nature of the scheme thus required some payments to investors for it to be at all successful. . . . Convicting Van Alstyne of money laundering for the bank transfers inherent in the 'scheme' central to the mail fraud charges thus presents a 'merger' problem closely parallel to the one that underlay the majority result in *Santos*." (quoting *Santos*, 553 U.S. at 517) (editing in original; citation omitted)).

Furthermore, it is not sufficient to overcome the merger problem that the legal elements of the underlying crime and money laundering do not necessarily overlap. Rather, courts must look to the actual conduct charged to determine whether the conduct alleged to produce the proceeds is distinct from the conduct alleged to constitute money laundering. As *Santos* recognized, "merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime," and merger can occur through "transactions which are not elements of the offense." 553 U.S. at 516; *see also, e.g.*, *Van Alstyne*, 584 F.3d at 815 ("[O]ur analysis of the 'merger' problem in the mail fraud context must focus on the concrete details of the particular 'scheme to defraud,' rather than on whether mail fraud generally requires payments of the kind implicated in *Santos*."). In short, where the conduct alleged to constitute money laundering "was a central component" of the underlying scheme, *id.*, a merger problem arises. *See also United States v. Bush*, 626 F.3d 527, 537 (9th Cir. 2010) ("As we highlighted in *Van Alstyne*, the import of *Santos* is its requirement that a court evaluate whether the government has been redundant in

10

its prosecution of a fraudulent scheme – that is, whether the charges separate necessary parts of the whole and treat them as independent bases for criminal liability.").

      **B. The government's own theory of concealment money-laundering conspiracy runs headlong into the merger problem.**

As charged, the conspiracy at issue was for SpineFrontier to pay funds to IME, for the purpose of facilitating the alleged kickback payments, while concealing that SpineFrontier was the source of the funding for those supposed bribes. Because concealment money laundering requires not just transactions designed to conceal something, but specifically concealing transactions in funds that are themselves proceeds from otherwise unlawful activities, the government also charges that the funds SpineFrontier agreed to pay to IME were the proceeds of the supposed kickback scheme. As a result, the charged conspiracy was one by which funds would be transferred to IME allegedly to make the very kickback payments that resulted in the SpineFrontier funds being proceeds from unlawful activity. In short, the same conduct and concealing purpose is charged as the basis for both the AKS and money-laundering counts. This presents a prototypical merger problem in that the alleged money-laundering conspiracy – conspiring to provide funds to IME for use in making kickback payments – is an essential part of the underlying criminal activity charged – agreeing to pay and paying kickbacks.

Indeed, as the Indictment tells the story, the use of IME was not some separate activity for the purpose of laundering money, but was an integral part of the underlying AKS violation. Specifically, the government has attempted to use the involvement of IME to satisfy the specific-intent requirement of an AKS violation (albeit unsuccessfully, for reasons set forth in the defendants' separate motion concerning that requirement). For example, with respect to the charge of conspiracy to violate the AKS, the Indictment charges that the defendants "[used] IME as a vehicle to funnel bribe payments to surgeons … and to conceal the true nature of the relationship

11

between SPINEFRONTIER and those surgeons." (Indictment ¶ 37(d).) It further alleges that IME was used "in part to evade Sunshine Act reporting obligations." (*Id.* ¶ 37(c)). While demonstrably false, the government chose to allege the use of IME as an intermediary for the AKS scheme it charges. Charging the use of IME both as a "funnel" for kickback payments, purportedly to satisfy the *mens rea* requirement for the AKS charges, and, at the same time, to satisfy the concealment element of the money-laundering charge, results in the two charges impermissibly merging, requiring dismissal of Count Eight.

In meet-and-confer discussions, the government has suggested that the choice to charge money-laundering conspiracy, without any substantive money-laundering charge, might solve the merger problem. The government is wrong. Money-laundering conspiracy carries the same twenty-year statutory maximum sentence as a substantive money-laundering charge. Further, the conspiracy alleged is an agreement to pay money to IME to fund the very payments to surgeons that would make the money paid "proceeds" from unlawful activity. Thus, based on the express factual basis set forth in the Indictment, the conspiracy charged is in no sense separate from the underlying charged AKS violations. In fact, the Indictment alleges not just substantive AKS violations, but also an AKS conspiracy. And as noted above, the Indictment expressly alleges that among the "manner and means" by which the AKS conspiracy was carried out was use of IME, "in part to evade Sunshine Act reporting obligations," and "as a vehicle to funnel bribe payments to surgeons." (Indictment ¶ 37(c) & (d).) That exact same alleged agreement to use IME is the basis for the concealment money-laundering conspiracy charge, making not just the substantive AKS charges, but also the AKS conspiracy charge, entirely intertwined with, and thus improperly merged with, the money-laundering conspiracy charge.

12

Nor is this a case in which a conspiracy to use money transfers to **promote** further underlying violations results in sufficient separation between a money-laundering conspiracy and substantive underlying crimes producing proceeds. In *United States v. Cloud*, 680 F.3d 396, 408 (4th Cir. 2012), for example, the court found a merger problem with substantive money-laundering counts, but not with a money-laundering conspiracy charge, because "there was evidence that [defendant] used the profits from his previous flips to finance additional [unlawful transactions]," such that "[i]n using monies from previous properties to finance future purchases, [defendant] was not paying the 'essential expenses' of the underlying crime," but funding future crimes. The facts that the conspiracy in *Cloud* was for promotional money laundering and that the transferring of funds was used to further future crimes were critical to the requisite separation between the money-laundering conspiracy charge and each of the substantive underlying charges (in that case, mortgage fraud). Here, in contrast, not only do both the AKS substantive and conspiracy charges rely on the same use of IME as does the money-laundering charge, but the latter is not for promotional money laundering. As discussed above, the only theory of money laundering is concealment, in the course of paying the alleged kickbacks that violated the AKS. In short, there is no charge that the defendants conspired to use proceeds from one **completed** AKS violation to fund other illegal activity.

### C. The amendment of 18 U.S.C. § 1956 to define "proceeds" as including "gross receipts" renders the statute unconstitutional to the extent applied to use of gross receipts to pay expenses of the underlying crime.

As noted above (*see* note 1), *Santos* interpreted "proceeds" within the money-laundering statute to mean profits, and to exclude gross receipts. Among the Court's reasons for reaching that conclusion was that interpreting "proceeds" to include gross receipts, at least where those receipts were used to fund the underlying crime, would result in a merger problem. As also noted above, merger gives rise to a double-jeopardy problem under the Fifth Amendment.

13

Congress responded to the *Santos* decision by amending the money-laundering statute to include "gross receipts" within the definition of "proceeds." *See* Pub. L. No. 111–21, § (2)(f)(1) (May 20, 2009). While this amendment effectively overruled *Santos*'s holding as to the statutory meaning of "proceeds," it did not, of course, address the Court's concerns regarding merger. To the contrary, the amendment exacerbated the problems the Court had sought to avoid when interpreting "proceeds" more narrowly, by expressly adopting the broader definition without solving the merger problem that the Court had identified. As *Santos* observed, if "proceeds" includes receipts, "nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." *Santos*, 553 U.S. at 515. The Court further observed that this "merger problem is not limited to lottery operators":

> For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds … would violate the money-laundering statute.

*Id.* at 516.

To the extent the money-laundering statute now applies by its plain language to "gross receipts" of unlawful conduct, such that use of gross receipts to pay the expenses of the same unlawful activities that make those gross receipts "proceeds" of crimes, the statute gives rise to an unconstitutional double-jeopardy problem: the constitutional problem that *Santos* sought to avoid by interpreting "proceeds" more narrowly.

## II. THE PUBLIC DISCLOSURE OF SPINEFRONTIER PAYMENTS PRECLUDES ANY CHARGE OF CONCEALMENT MONEY LAUNDERING.

In the absence of any agreement to conceal SpineFrontier as the source of payments, the money-laundering charge cannot succeed. As discussed above, the Indictment charges only

14

concealment money laundering, not promotional money laundering. That charge, in turn, requires knowledge that the transaction was designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). The prosecution's theory of concealment is that SpineFrontier paid the funds through IME, rather than directly to surgeons, to conceal SpineFrontier as the source of the payments.

Even putting aside the merger problem discussed in Part I above, this charge fails for the additional reason that there was never any concealment of SpineFrontier's involvement, as evidenced by material of which this Court can take judicial notice. In a separate motion filed simultaneously with this motion, the defendants demonstrate that SpineFrontier unquestionably submitted hundreds of reports to the federal government *in its own name*, regarding the payments to physicians at issue. The Indictment itself makes reference to the Physician Payments Sunshine Act, 42 U.S.C. § 1320a-7h(a)(1)(A), describing that Act as requiring "medical product manufacturers, such as SPINEFRONTIER, to disclose to [the federal Centers for Medicare & Medicaid Services ("CMS")] any payments or transfer of value made to a physician, including surgeons, or a hospital, as well as any physician ownership or investment in the covered manufacturer." (Indictment ¶ 21.) As set forth in the contemporaneous motion to dismiss the AKS charges, SpineFrontier in fact made public Sunshine Act disclosures, using its own name, concerning the payments that the government alleges were unlawful.

Regardless of the disputed issue as to whether these payments were for legitimate consulting purposes or were kickback payments, as the Indictment labels them, the government cannot legitimately dispute – and has not disputed during meet-and-confer discussions – that the disclosures were in fact made, using SpineFrontier's name. *See* Fed. R. Evid. 201(b)(2) (allowing

15

for judicial notice of facts not subject to reasonable dispute because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Indeed, as described in the motion to dismiss the AKS charges, one can search CMS's own website to see the disclosures of payments from SpineFrontier to surgeons at issue here. Thus, SpineFrontier disclosed *itself* as the source of those payments from IME in public filings with CMS – removing any basis for a charge of concealment. Without concealment, the money-laundering charge necessarily fails.

## Conclusion

Based on the foregoing, the defendants respectfully request that the Court dismiss Count Eight of the Indictment.

Respectfully submitted,

/s/ Joshua L. Solomon
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

/s/ William W. Fick
Daniel N. Marx (BBO #674523)
William W. Fick (BBO #650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

**Certificate of Service**

The undersigned certifies that this document, filed through the ECF system, will be electronically served on counsel who are registered users of ECF on January 26, 2024.

/s/ Joshua L. Solomon